FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E.D.N.Y

★   SEP 2 8 2011   ★

LONG ISLAND OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
FRANK VLAHADAMIS,
MARIA VLAHADAMIS,
and HAMPTON BAYS DINER CORP.,

     Plaintiffs,

   -against-

JAMES KIERNAN,
VINCENT CAGNO,
STEPHEN A. FRANO,
CHERYL KRAFT,
CHRIS HANSEN, and
BRIAN K. WILLIAMS,
*in their individual capacities*;
THE SOUTHAMPTON TOWN POLICE,
THE TOWN OF SOUTHAMPTON,
and JOHN/JANE DOES 1-7,

     Defendants
-------------------------------------------------------------X

**MEMORANDUM & ORDER**
**08 CV 2876 (DRH)(AKT)**

**APPEARANCES:**

**Campanelli & Associates, P.C.**
Attorneys for Plaintiffs
623 Stewart Avenue, Suite 203
Garden City, NY 11530
By: David A. Antwork, Esq.
   Charles A. Martin, Esq

**Devitt, Spellman, Barrett, LLP**
Attorneys for Defendants Kiernan, Cagno, Frano, Kraft, Hansen, Williams, The Southampton
Town Police Department, and the Town of Southampton
50 Route 111
Smithtown, NY 11787
By: Kelly E. Wright, Esq.
   Jeltje de Jong, Esq.

**HURLEY, Senior District Judge:**

Plaintiffs bring this Civil Rights action pursuant to 42 U.S.C. §§ 1983 ("§1983") and 1985 ("§1985"), claiming violations of the Equal Protection clause, due process, as well as claims for malicious prosecution and for conspiracy to violate plaintiffs' Civil Rights.  Presently before the Court is defendants' motion for summary judgment pursuant to Fed. R. Civ. P. 56. For the reasons set forth below, the motion is granted in part and denied in part.


## BACKGROUND

Plaintiffs Frank and Maria Vlahadamis own and operate the Hampton Bays Diner Corporation, which has done business in Hampton Bays, New York[1] as the Hampton Bays Diner ("the Diner") since 1990. (Defs' Local Rule 56.1 Statement of Undisputed Facts ("56.1 Stmt.") ¶¶ 2-3.)  Plaintiff Frank Vlahadamis also owned a diner with a different business partner at the same location under the name "Vlorio Restaurant" since 1983.  (56.1 Stmt. ¶ 7.)

Beginning in 1983, Mr. Vlahadamis enjoyed a relationship with the Southampton Town Police that he describes as "excellent," (Deposition of Frank Vlahadamis" ("FV Dep.") at 29; 56.1 Stmt. ¶ 18), and a relationship with the Town's Building Department and Fire Marshal that he describes as "very close," (FV Dep. at 30; 56.1 Stmt. ¶ 19; *see* 56.1 Stmt. ¶ 20). These relationships, however, allegedly began to sour in 2006 when the Diner began hiring a Disc Jockey ("DJ") to play "Hispanic-oriented music" and held "a weekly 'Hispanic Night' with the intent of drawing patrons of Hispanic and Latino ancestry to the[] restaurant." (Compl. ¶¶ 6-7; *see* 56.1 Stmt. ¶ 32.)  Plaintiffs claim that once the Diner was successful at attracting a steady

---

[1] Hampton Bays is located within the Town of Southampton.

stream of Hispanic customers,[2] defendants began to "launch a series of attacks upon the plaintiffs, with the intent to prevent the[m] from continuing to draw Hispanics into their restaurant, and to punish then for doing so in the first instance." (Compl. ¶ 7.)  Allegedly, the defendants' ultimate goal was to "create a false basis upon which they could seek to induce the New York State Liquor Authority ["SLA"] to cancel or revoke the plaintiffs' [ ] Liquor license." (Compl. ¶ 96.) These purported "attacks" took the form of the following acts by the defendants:

1.  Since 2006, the time in which the Diner hired a DJ and began hosting "Hispanic nights," "fire marshals and code enforcement officers began coming into the bar at the Diner every weekend." (56.1 Stmt. ¶ 48; FV Dep. at 93.)

2.  After the commencement of weekend "Hispanic nights," there was a noticeable increase in police presence in the restaurant's parking lot. (FV Dep. at 59-60.) With a frequency not specified in the record, officers would stop their cruiser in the parking lot and "harass" the customers by "mak[ing] them open the[ir] cars and search[ing] their vehicles." (*Id.*)  According to Mr. Vlahadamis's testimony, in the years before the restaurant targeted Hispanic patrons, "there were a lot more people in the restaurant [with] lines around the building and we never had police presence there, ever." (FV Dep. at 63-64.)

3.  On an unspecified Thursday night, sometime before May 25, 2008 (*see* FV Dep. at 120:23-24), when the Diner was offering a free buffet and "Spanish music," two police cruisers pulled into the parking lot by the entrance to the establishment, turned on their

---

[2] Mr. Vlahadamis testified that when a Disc Jockey was hired in 2006 to play "Hispanic music on Friday and Saturday nights, the percentage of Hispanic customers who appeared on those nights went from less than 20 percent to more than 95 percent." (FV Dep. at 46-50.)

interior lights, and displayed their weapons, "exchanging bullets back and forth playing with the guns with each other." (FV Dep. at 121.)  This display alarmed a number of customers who would not leave while the officers remained outside. (FV Dep. at 121.)

4.  On September 3, 2006, the Town Police conducted an undercover investigation at the Diner, in which an officer entered the Diner after midnight and purchased cocaine from one of the patrons in a bathroom stall. (Ps' Ex. G.)

5.  On September 16, 2006, the Town Police conducted a second undercover investigation in which an officer entered the Diner and again purchased cocaine from two separate patrons in a bathroom stall. (Ps' Ex. G.)

6.  On October 8, 2006, during a third undercover investigation, a patron in the bathroom of the Diner gave the undercover Town police officer cocaine. (Ps' Ex. G.)

7.  On January 31, 2007, the Town Police issued four referrals to the SLA, reporting on each of the incidents in which drugs were given or sold to undercover officers at the Diner. The referrals alleged that plaintiffs violated Section 106(6) of the New York Alcoholic Beverage Control Law by allowing the Diner to become "disorderly,"[3] to wit, failing "to implement proper procedures to detect and/or deter drug sales from occurring within the premises." (Ps' Ex. H.)  If the charges in a referral to the SLA are sustained by an Administrative Law Judge, it could lead to the revocation, suspension, or termination of an establishment's liquor license. N.Y. Alcoholic Beverage Control Law ("NY ABC Law") § 106.  The Town had never before issued a referral to the SLA that involved the Diner. (FV Dep. at 68.)

---

[3] N.Y. Alcoholic Beverage Control Law § 106(6) states in relevant part: "No person licensed to sell alcoholic beverages shall suffer or permit . . . such premises to become disorderly."

4

8. On May 7, 2007,[4] the Town Fire Marshal cited the Diner for "fail[ing] to maintain an accurate count of the occupant load within the establishment." (Ps' Ex. O; 56.1 Stmt. ¶ 49.) The Diner's count estimated 21 occupants were present, while the actual count by the fire marshal reflected approximately 85.[5] (Ps' Ex. O; 56.1 Stmt. ¶ 49.)

9. On May 20, 2007 just after one in the morning, Stephen Frano, one of the Town's Code Enforcement Officers (Ps' Ex. R), and Chris Hansen, a Town Fire Marshals (Ps' Ex. Q), arrived at the Diner for an inspection. As a result, the Diner was cited for three separate infractions: (1) allowing a cesspool at the back of the premises to overflow and spill waste onto the parking lot (Ps' Ex. Q; 56.1 Stmt. ¶ 54), (2) failing to cover the opening to the cesspool (Ps' Ex. Q), and (3) operating a "bar/nightclub" without first obtaining a certificate of occupancy for such use,[6] (Ps' Ex. R; 56.1 Stmt. ¶ 53).

10. On June 20, 2007, the Town's Fire Marshal's Office issued a referral to the SLA, listing a number of Diner's violations, including operating a nightclub, having an overflowing cesspool, failing to cover the opening to the cesspool, and failing to maintain an accurate count of the patrons inside the establishment. (Ps' Ex. S.)

11. On May 25, 2008,[7] Town police officers and agents from the SLA conducted an

---

[4] There is quite a bit of discrepancy in the record as to the date of this incident. The notice of violation states that the incident took place on May 7, 2006 (Ps' Ex. O), while Brian Williams's deposition suggests that it occurred on May 22, 2007 (Williams Dep. at 19), which was a Tuesday. But the Complaint alleges it occurred on May 7, 2007 (Compl. ¶ 161; FV Dep. at 93), and the SLA referral indicates that it happened on May 20, 2007 (Ps' Ex. S). As the notice of violation was sworn to on June 4, 2007, this likely rules out that the incident occurred in 2006, and after reviewing all of the references to the incident, it appears from the record that (1) there was only one such incident, and (2) that the violation occurred on May 7, 2007.

[5] The defendants' count of 85 occupants was still lower than the 94-person maximum for the rear bar area of the Diner. (Ps' Ex. O.)

[6] This last violation is referred to throughout the parties' papers as a "change of use" violation.

[7] Mr. Vlahadamis testified that this incident occurred on May 25, 2007. (FV Dep. at 107.) However, the Town records from that night indicate that the event transpired on May 25, 2008. (Ps' Ex. Z.)

5

"inspection" of the Diner. (56.1 Stmt. ¶ 55.)  During the inspection, Mr. Vlahadamis

signed a statement that was prepared by either Town officers or an SLA agent, declaring

that the Diner "operated the rear [of the building] as a nightclub on Fridays and Saturdays

from around 11 p.m. to around 4 a.m. . . ." (Ps' Ex. Z.)[8]

12. On an unspecified night, the Town Police pulled over a car that was leaving a nearby

nightclub to conduct a "DWI check." (FV Dep. at 126.) During that stop, the cruisers

blocked the entrance and exit to the Diner's parking lot "for over an hour" preventing

customers from entering or leaving the Diner. (*Id.*)  According to plaintiffs, in the years

prior to the "Hispanic Nights," officers would always guide drivers who were being

pulled over into the parking lot, leaving the entrance clear. (*Id.*)


In response to the Town's administrative referrals, the SLA held hearings on the matter.

In a June 20, 2008 decision, regarding the January 31, 2007 referrals for the sale of drugs on the

premises, an Administrative Law Judge held that the charges for "suffering or allowing the

premises to become disorderly by allowing the trafficking of narcotics on the three different

occasions" could not be sustained. (Ds' Ex. M.)  The opinion noted that plaintiffs hired a retired

police officer with 30 years experience to oversee security, installed a number of security

cameras, and that Mr. Vlahadamis was present at the Diner "on a regular basis." (*Id.*)

Additionally, the drug sales took place in a bathroom stall outside the presence of other

customers or any employees.  The Judge therefore found that plaintiffs "did everything in their

---

[8] Mr. Vlahadamis claims that he was forced to sign the statement as the officials present informed him that if he did not, they would padlock the doors to the Diner during the upcoming Memorial Day weekend. (Plaintiffs' Rule 56.1 Counter-Statement ("56.1 Counter Stmt.") ¶ 56.)

power to prevent improper behavior or disorder," and that "[t]here was no evidence presented

that [plaintiffs] knew (or should have known) that there were any sales of cocaine being

conducted on the premises." (*Id.*)

A subsequent administrative decision was issued by the SLA regarding the Town's

second referral to the State authority.  The referral alleged violations of Rule 54.3 of the Rules of

the SLA, *see* 9 NYCRR 48.3, in that plaintiffs failed to conform with "applicable building codes,

and/or fire, health, safety and governmental regulations," which can be cause for revocation or

suspension of a liquor license. (Ps' Ex. U); NY ABC Law § 106.  Regarding the citation for the

overflowing cesspool, the SLA's May 9, 2008 opinion stated that plaintiffs swiftly responded to

remedy an "emergency situation," and that any charge that the overflowing cesspool could serve

as ground to revoke the Diner's license could not be sustained. (*Id.*)  The SLA also ruled that

because plaintiffs filed for a "change of use" with the Town to add a bar, and because the signage

designated the business as a "diner" the Authority did not find that it had been used as a

"nightclub."  The opinion did, however, state that there was evidence of an inaccurate count of

the customers present and issued a letter of warning.

Plaintiffs allege that the defendants' actions have forced them to abandon entirely their

efforts to target the local Hispanic population out of "fear of further attacks" by the defendants –

a decision that plaintiffs claim has cost them at least $20,000 a week in lost revenue. (Compl. ¶¶

209, 213.)

Defendants seek summary judgment pursuant to Fed. R. Civ. P. 56, arguing that (1)

plaintiffs' claims are not yet ripe for adjudication, (2) that the Equal Protection claims are

without merit, (3) that plaintiffs have failed to identify a property right or liberty interest to

7

support their due process claims, (4) that the intracorporate conspiracy doctrine bars plaintiffs'
§1985 conspiracy claim, (5) that the malicious prosecution claim fails because plaintiffs were
never actually prosecuted for a crime, and (6) that the individual defendants are entitled to
qualified immunity. Each of these arguments is discussed below.


# DISCUSSION

## I. LEGAL STANDARD

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate
where admissible evidence in the form of affidavits, deposition transcripts, or other
documentation demonstrates both the absence of a genuine issue of material fact and one party's
entitlement to judgment as a matter of law. *See Major League Baseball Props., Inc. v. Salvino,
Inc.*, 542 F.3d 290, 309 (2d Cir. 2008); *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716
(2d Cir. 1994). The relevant governing law in each case determines which facts are material;
"only disputes over facts that might affect the outcome of the suit under the governing law will
properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
242, 248, (1986); *see SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009);
*Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007). No genuinely triable factual
issue exists when the moving party demonstrates, on the basis of the pleadings and submitted
evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-
movant, that no rational jury could find in the non-movant's favor. *See SCR Joint Venture*, 559
F.3d at 137; *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R.

Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there is a genuine issue of material fact to be tried. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or more than "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted). Affidavits submitted in opposition to summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show that the affiant is "competent to testify to the matters stated therein." *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (citing Fed. R. Civ. P. 56(e)).[9]   "Rule 56(e)'s requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial." *Patterson*, 375 F.3d at 219 (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999)).

When determining whether a genuinely disputed factual issue exists, "a trial judge must

---

[9] The cited portion of Fed. R. Civ. P. 56(e) was renumbered as Rule 56(c)(4) as part of the amendments to Rule 56 effective December 1, 2010.

bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 254-55. A district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing Anderson, 477 U.S. at 252), because "the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of a summary judgment motion." *See Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the nonmovant will bear the ultimate burden of proof at trial on an issue , the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." Id. at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587). In deciding a summary judgment motion, a court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-moving party. *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987).

## II.   TITLE II CLAIMS

Count I of the complaint is entitled "EQUAL PROTECTION CLAIMS UNDER THE FIRST AND FOURTEENTH AMENDMENTS OF THE U.S. CONSTITUTION (Equal Protection – 42 U.S.C. § 1983)."  The first six paragraphs of that Count, however, allege violations of Title II of the Civil Rights Act of 1964 (Public Accommodations), 42 U.S.C. §

2000a, *et seq. Id.*; (Compl. ¶¶ 266-71 ("[D]efendants undertook deliberate and calculated actions

to punish and attempt to punish the plaintiffs for exercising and attempting to exercise their

rights and privileges secured by 2000a and 2000a-1, in direct violation of 42 U.S.C. § 2000a-

2(c).")).[10]

Section 2000a-2(c) states that "[n]o person shall . . . punish or attempt to punish any

person for exercising or attempting to exercise any right or privilege secured by section 2000a or

2000a–1 of this title," which provides that "[a]ll persons shall be entitled to the full and equal

enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any

place of public accommodation, as defined in this section, without discrimination or segregation

on the ground of race, color, religion, or national origin." 42 U.S.C. § 2000a(a).

For the owners of an establishment (and the establishment itself) to bring suit against a

municipality for punishing them for exercising a right to enjoy their own establishment is, in a

word, unusual.  Furthermore, plaintiffs' Title II claim is misplaced.  To the extent that defendants

executed a scheme of "punishment" at all, the complaint does not allege any facts that such

punishment was for the exercise of plaintiffs' right to enjoy the "goods, services, facilities,

privileges, advantages, and accommodations" of their own Diner "without discrimination."

Rather, the pleading alleges that defendants punished plaintiffs for allowing their customers to

enjoy such a right.  Moreover, Mr. Vlahadamis testified that defendants did not discriminate

against him, or his wife, at all on account of his race, color, religion, or national origin. (56.1

Stmt. ¶ 44; FV Dep. at 78); *see* 42 U.S.C. § 2000a(a).  Therefore, to the extent that plaintiffs

---

[10] Plaintiffs also reference Title II in their procedural due process claim. (Compl. ¶ 313.)

11

assert claims under Title II,[11] such claims are dismissed.

## III.   EQUAL PROTECTION

### a.   Class-of-One and Selective Enforcement Claims Generally

The Equal Protection Clause of the Fourteenth Amendment guarantees "'[the] right to be free from invidious discrimination in statutory classifications and other governmental activity'." *Bernheim v. Litt*, 79 F.3d 318, 323 (2d Cir. 1996) (quoting *Harris v. McRae*, 448 U.S. 297, 322 (1980)). "The [Clause] requires that the government treat all similarly situated people alike." *Harlen Assocs. v. Inc. Village of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001); *accord City of Cleburne, Texas v. Cleburne Living Center*, 473 U.S. 439 (1985); *Disabled American Veterans v. United States Dep't of Veterans Affairs*, 962 F.2d 136, 141 (2d Cir. 1992).

In 2000, the Supreme Court identified a "class of one" cause of action under the Equal Protection clause where one is not alleging discrimination based on his or her membership in a protected class, but where one is singled out intentionally for arbitrary treatment without a rational basis. *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).  Under such a claim, a plaintiff must demonstrate that

> (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake.

*Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006).

---

[11] Notably, plaintiffs' memorandum of law in opposition to defendants' motion makes no reference to Title II.

Courts have also articulated a third element to class-of-one claims following *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591 (2008): "that the differential treatment [] received resulted from non-discretionary state action." *Balakrishnan v. Kusel*, No. 08-cv-1440,  2009 U.S. Dist. LEXIS 39394 at *15 (E.D.N.Y. May 6, 2009); *see Engquist,* 553 U.S. at 603 ("[S]ome forms of state action . . . by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments. . . . In such situations, allowing a challenge based on the arbitrary singling out of a particular person would undermine the very discretion that such state officials are entrusted to exercise.");[12] *see also Catcove Corp. v. Heaney*, 685 F. Supp. 2d 328, 333 (E.D.N.Y. 2010) (applying the third "discretion" element); *Tarantino v. City of Hornell*, 615 F. Supp. 2d 102, 117 (W.D.N.Y. 2009)(same); *Crippen v. Town of Hempstead*, No. 07-CV-3478, 2009 U.S. Dist. LEXIS 24820 at *12-*13 (E.D.N.Y. Mar. 25, 2009).

Although, the Complaint does not specify the particular theory underlying plaintiffs' Equal Protection claim, their opposition memorandum argues that, in addition to a class-of-one equal protection claim, they are further entitled to relief under a selective enforcement Equal Protection claim. (Ps' Memo, Section III(A).)  A selective enforcement claim requires a plaintiff to establish the following:

> (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.

*LaTrieste Restaurant & Cabaret v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir.

---

[12] Although *Engquist* dealt exclusively with the public employment context, many district courts in the Second Circuit have extended its holding beyond that area, even though the Circuit has yet to rule on the breadth of its application. *See DePietro v. City of New York*, 2010 U.S. Dist. LEXIS 8598 (E.D.N.Y. Jan. 29, 2010)(collecting cases).

1994) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)); *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 (2d Cir. 2001).

Some courts, however, have questioned whether *Engquist's* narrowing of class-of-one claims to non-discretionary acts had the effect of eliminating all selective enforcement claims. *Compare Alfaro v. Labrador*, No. 06-CV-1470, 2009 U.S. Dist. LEXIS 72532 (E.D.N.Y. Aug. 14, 2009) (disagreeing with the proposition that "class of one claims can *never* be brought in the law enforcement context)(emphasis in original), *and Balakrishnan*, 2009 U.S. Dist. LEXIS 39394 at *21-*23, n.12 (analyzing both class-of-one and selective enforcement claims but noting that "*Engquist* has likely added another facet to this inquiry -- whether a selective enforcement cause of action, assuming this cause of action remains valid at all, exists where a plaintiff pleads disparate treatment as the result of discretionary state action"), *and Sloup v. Loeffler*, No. 05-CV-1766, 2008 U.S. Dist. LEXIS 65545 (E.D.N.Y. Aug. 21, 2008)(analyzing plaintiff's claims under both class-of-one and selective enforcement), *with Tarantino v. City of Hornell*, 615 F. Supp. 2d 102, 112 (W.D.N.Y. 2009)(declining to apply class-of-one claims to the enforcement of City code), *and Nasca v. Town of Brookhaven*, No. 05-CV-122, 2008 U.S. Dist. LEXIS 73644, at *31 n.4 (E.D.N.Y. Sept. 25, 2008) ("[T]o the extent plaintiff is challenging the discretionary decisions by the Town as to the enforcement of its permit laws and code provisions, *Engquist* suggests that 'class of one' challenges cannot be asserted as to such decisions"); *see also Flowers v. City of Minneapolis*, 558 F.3d 794, 799-800 (8th Cir. 2009)(holding that a police officer's investigative decisions cannot be subject to a class-of-one claim); *United States v. Moore*, 543 F.3d 891, 901 (7th Cir. 2008)(The discretionary decisions of a prosecutor cannot be attacked through a class-of-one claim.).   Although *Engquist* did not explicitly eliminate selective

14

enforcement claims, its hypothetical involving the discretion of a police officer to decide which drivers to ticket for speeding violations has suggested to some that the decision intended that effect. *Tarantino*, 615 F. Supp. 2d at 117 ("Of course, an allegation that speeding tickets are given out on the basis of race or sex would state an equal protection claim, because such discriminatory classifications implicate basic equal protection concerns. But allowing an equal protection claim on the ground that a ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the discretion inherent in the challenged action."(citing *Engquist*, 553 U.S. at 604)).

Nevertheless, in light of the facts of this case, and the *Engquist* Court's treatment of the facts in *Olech*, this Court is not inclined to take such a broad reading of *Engquist* to eliminate selective enforcement claims altogether.  As Judge Seybert noted in *Alfaro*,

> *Engquist's* discussion of [*Olech*] appears to define "discretionary" decisions, for the purpose of barring "class of one" claims, as those that involve discretion that is actually exercised on a *day-by-day* basis, rather than decisions that are theoretically discretionary but – as a practical matter – actually depend on *de facto* standards. Specifically, *Engquist* distinguished [*Olech*] based on the Court's understanding that the [*Olech*] zoning board was not "exercising discretionary authority based on subjective, individualized determinations." *Engquist*, [553 U.S. at 602]. Rather, the Supreme Court commented, the fact that every other property owner had been required to give an identical easement – 15 feet – demonstrated "the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed." *Id.* But Engquist does not claim, and [*Olech*], does not evidence, that the "clear standard" alluded to was an official standard which constrained the zoning board's power. Nor does *Engquist* claim, or [*Olech*] suggest, that the zoning board lacked the statutory authority to treat some property owners different than others (that is, after all, what zoning boards frequently do). Rather, the "clear standard" that *Engquist* references appears to have emerged from the zoning board's consistent pattern and practice – that, at a

15

> practical level, it had not exercised its statutory discretion on a
> case-by-case basis but instead had required the same standard for
> everyone.

*Alfaro*, 2009 U.S. Dist. LEXIS 72532 at *31-*32.

The Court will therefore separately analyze plaintiffs' Equal Protection claims under both

theories. *Accord Balakrishnan,*2009 U.S. Dist. LEXIS 39394 at *22; *Sloup*, 2008 U.S. Dist.

LEXIS 65545.


### b. Class-of-One Claim

#### i. The Parties' Contentions

Under a class-of-one claim, plaintiffs must first demonstrate that they were treated

differently from those who possess a "high degree of similarity." *Ruston v. The Town Bd. for the*

*Town of Skaneateles*, 610 F.3d 55, 60 (2d Cir. 2010). In the Complaint, plaintiffs allege that

there were at least six other restaurants within the town that "similarly employed, and continue to

employ, [DJs] to encourage customers to patronize their restaurant, and none of [these]

restaurants have ever been charged, by the defendants, with [a] 'change of use' violation."

(Compl. ¶ 277.) The six restaurants include Tom McBrien's, Top of the Wharf, Buckley's Inn

Between, 75 Main Street, Tide Runners, and Oaklands.

Defendants respond that "none" of these restaurants are similarly situated to the Diner.

(Ds' Memo at 7.) In this pursuit, defendants identify particular aspects that differentiate these

restaurants from plaintiffs' Diner in the context of a change-of-use violation. For example,

Oaklands did not have a DJ playing music after 10 p.m. (Ds' Memo at 7 (citing FV Dep. at 135)),

and neither Tide Runners, Buckley's Inn Between, nor Top of the Wharf maintains separate areas

16

of the restaurant for food and music.[13] (Ds' Memo at 7 (citing FV Dep. at 136).)

Defendants further argue that despite plaintiff's allegations to the contrary, some of the restaurants cited by plaintiffs – as well as others not cited by them – were "regularly investigated and/or referred to the [SLA] for similar violations as those issued to the plaintiffs." (Ds' Memo at 8.) In support, defendants cite three establishments that were cited for change-of-use violations because they provided DJs or live music or otherwise operated as a nightclub: Cabana Capri, Buckley's Inn Between, and Tide Runners.[14] (Deposition of Stephen Frano ("Frano Dep.") Ds' Ex. F, 86; Deposition of Cheryl Kraft ("Kraft Dep."), Ds' Ex. G, 51-52, 58-63; Ds' Ex. L.)

Other establishments, such as Life's a Beach and Conscious Point Inn were cited for overflowing cesspools, and during Brian William's eight years as the Town Fire Marshal, he issued citations for failing to maintain an accurate count of patrons between 10 and 20 times. (Deposition of Brian K. Williams ("Williams Dep.") 29, D's Ex. H.) In addition, on one of the nights that defendants conducted an undercover narcotics investigation at the Diner, investigations were also conducted at four other establishments within the town: Porky's Hamptons, Neptune's Beach Club, White House, and Boardy Barn. (Kiernan Dep. at 201.)

Plaintiffs counter that all six[15] of the establishments cited in the complaint were indeed

---

[13] Although one could speculate on the impact of these factors in determining whether an establishment has crossed the line from restaurant to cabaret or nightclub (i.e. changed their use without seeking permission from the local zoning board), the precise relevance of these factors vis-a-vis the Town's zoning laws have not been established by defendants.

[14] Defendants proffer that a fourth business was cited for such violations: Paddy's Inc. The "Paddy's Inc." violation, however, refers to the same citation issued to Buckley's Inn Between; "Two Paddy's Inc." is the owner and/or operator of that restaurant. (See Ds' Ex. M.)

[15] Although plaintiffs initially contend in their memorandum of law that all six businesses were similarly situated (Ps' Memo at 15), they later exclude Oaklands and 75 Main Street in their discussion of exactly how each restaurant bears similarity to the Diner. Furthermore, defendants assert in their 56.1 Statement that 75 Main Street is outside their jurisdiction and plaintiffs do not dispute this assertion. (56.1 Stmt.¶ 66; 56.1 Counter Stmt. ¶ 66.) The Court therefore assumes that plaintiffs have abandoned their allegation that these two businesses are comparators for

similarly situated, in that all were restaurants located in the Town of Southampton, all of them served food and alcohol, all advertised as having DJs and/or live music,[16] and none possessed a certificate of occupancy to operate as a "nightclub" or to offer live music. (Ps' Memo at 15.) Despite that similarity, plaintiffs note, defendants never issued a violation for a change of use to Tom McBrien's or Top of the Wharf.[17] (Ps' Memo at 16 (citing Kraft Dep. at 64-66).)  Plaintiffs further argue that although change-of-use violations were actually issued to Buckley's Inn Between and Tide Runners, neither of these businesses was referred to the SLA for such violations, as the Diner had been.[18] (Kraft Dep. at 81-82.) Further, there is no evidence that any of the lesser charges issued to other restaurants such as overflowing cesspools, or failing to keep an accurate count of patrons were referred to the SLA, as they were for plaintiffs.

    ii. *Change-of-Use Violations*

It is clear from the record that plaintiffs have not shown they were treated differently from their comparators with respect to the issuance of citations for change-of-use violations.

---

the purpose of their Equal Protection claims.

    [16] Plaintiffs submit advertisements taken out by each of the establishments in local newspapers as evidence of these activities. (Ps' Exs. C-G.)

    [17] Regarding Tide Runners, although plaintiffs concede that that restaurant was cited for a change-of-use violation, defendants have not cited them for such a violation since 2006. (Ps' Ex. Y.)  Cheryl Kraft, the Town's Chief Fire Marshal, testified that the lack of citation for Tide Runners in recent years is likely due to the fact that the live music advertised was held during the afternoon, before the inspectors were on duty. (Deposition of Cheryl Kraft ("Kraft Dep."), 61-62, Ps' Ex. W.) Similarly, Kraft suggested that violations were not issued to Tom McBrien's because that establishment only offers a DJ on Thursday nights, and the inspectors only conduct inspections on Friday, Saturday, and (during holiday weekends) Sunday nights. (Kraft Dep. at 64.)

    [18] Defendants proffer that one restaurant, Cabana Capri, was both issued a change-of-use violation and referred to the SLA for that violation.  This claim is based on the testimony of Stephen Frano. At deposition, however, Frano cold not remember the date of that referral, and his only knowledge of referrals from 2007 to 2009 – the years in which plaintiffs were cited for the same violations – is derived solely from the hearsay statements of other officers. (*see* Frano Dep. at 66)("Q: Do you have a basis to believe that [the Town of Southampton] ha[s] sent additional referrals [in 2007, 2008, or 2009]? A: Yes. Q: What is that basis? A: General conversations with officers, where other referrals were made for other establishments.").) To the extent that an additional basis for Frano's knowledge was established later in his deposition, no such testimony was submitted by defendants.  The Court will therefore not consider the facts regarding Cabana Capri's referral to the SLA in deciding this motion.

Two of the establishments that were purportedly similarly situated to plaintiffs (Tide Runners and Buckley's Inn Between) were also cited by the Town for change-of-use violations.  Further, plaintiffs do not state whether the other two establishments that were not cited for change-of-use violations (Tom McBrien's and Top of the Wharf) were grandfathered in for live music before the Town code was changed. (*See* Kraft Dep. at 39-40.)  If these establishments were in fact grandfathered in, then they would not be similarly situated to plaintiffs' Diner because they would not be subject to a change-of-use violation for having DJs or live music in the first place.

However, the inquiry does not end there.  The crux of plaintiffs' claims as they read in the Complaint is not so much that such violations were issued, but that these violations, even relatively minor ones, were referred to the SLA for further action.  On this front, plaintiffs have shown that even where defendants issued comparable violations to arguably similarly situated establishments, the violations were not referred to the SLA.  Here, plaintiffs were similarly situated to Tide Runners and Buckley's Inn Between in that they were all cited for change-of-use violations, but treated differently in that these two establishments were not referred to the SLA for their infractions, as plaintiffs were.

The only suggestion that a "legitimate government policy" underlies this disparate treatment appears in testimony from Cheryl Kraft, the Town's Chief Fire Marshal. There, she testified that although she did not make the determination of what matters to refer, it was her "understanding that the Diner had repeated problems that were documented, in addition to the change of use issue.  There was a concern for the number of people within and the septic, other issues that were there." (Kraft Dep. at 119.)  However, Kraft's "understanding" after the fact of why other officials may have singled out the Diner for a referral to the SLA does not provide

19

sufficient evidence of a legitimate policy to warrant summary judgment.[19] Nor does this rationale hold water in light of the circumstances of the Diner's violations. As defendants concede, plaintiffs' failure to keep an accurate count did not actually represent a danger to those present at the Diner. (Williams Dep. at 28.) And there is no evidence that the cesspool issue was anything more than a single, isolated incident, that plaintiffs had already begun to address by the time defendants arrived to inspect the premises.[20] There are therefore questions of fact as to whether such ancillary concerns actually motivated defendants to single out plaintiffs' violations for referral. A rational jury could therefore conclude that plaintiffs were treated differently than those similarly situated through defendants' referrals to the SLA of plaintiffs' change-of-use violation and that no rational basis motivated this disparity.

This conclusion is not altered by defendants' arguments that there existed other establishments in town that catered to Hispanic clients, but which were not subjected to any increased or abnormal enforcement by the Town. (Reply Memo at 6; 56.1 Stmt. ¶¶ 38-43.) The evidentiary basis for this assertion is supported entirely by the hearsay testimony of Mr. Vlahadamis who has no personal knowledge of the Town's treatment of these establishments over time. (FV Dep. at 70-77.) As plaintiffs rightly point out in their 56.1 counter statement in which they dispute such facts, Mr. Vlahadamis is not present at all times at these establishments, and could not accurately speak to the level of enforcement activity there. Aside from this inadmissible testimony, there is no evidence that the enforcement of zoning, code or other violations differed in any material way between these businesses and the plaintiffs' Diner.

---

[19] Moreover, defendants do not assert this argument in their memorandum of law.
[20] The citation issued to the plaintiffs for this incident further evidences that the cover of the cesspool had to be removed in order to pump the overflowing tank to an adjacent pool. (Ps' Ex. Q; *see* Williams Dep. at 24-25.)

### iii.  Drug Investigations

Regarding the undercover drug operations, James Kiernan testified that the Southampton Police Department went to a number of different restaurants and bars in the town to conduct similar undercover drug buys.  (Deposition of James Kiernan ("Kiernan Dep.")  14, Ds' Ex. E.) Defendants indentify a number of other establishments that were investigated for drug sales, and where arrests were made on the very same night as the Diner.  Kiernan also testified that the Department would, as a practice, refer all such matters to the SLA unless the drug sale was made in the parking lot of the premises, rather than inside the establishment. (Kiernan Dep. at 25.)

In contrast to the referrals of plaintiffs' change-of-use violations, plaintiffs have not identified a single similarly situated business that was treated differently regarding either the institution of an undercover drug operation on their premises, or the referral to the SLA of any consummated drug sale.  In fact, the only mention of other businesses that were subject to the same undercover operations was provided by the defendants in their showing that other restaurants and bars were also investigated.  Though plaintiffs vehemently argue that the defendants "had no basis to believe" that drug sales were occurring inside the Diner before conducting their investigation (Ps' Memo at 8), and that the related charges with the SLA for allowing the premises to become "disorderly" could not be sustained, they do not provide any evidence to support a claim that their treatment by defendants vis-à-vis the undercover drug investigation differed in any way from other establishments which were similarly investigated. Without such evidence, plaintiffs cannot pass the initial threshold for an Equal Protection claim. Plaintiffs' Equal Protection claims pertaining to the drug investigations and the subsequent related referrals to the SLA, are therefore dismissed.

21

     *iv.   Local Code Violations*

Plaintiffs likewise fail to identify similarly situated businesses with regard to their cited violations involving the cesspool and the inaccurate count of patrons.  First, plaintiffs do not pinpoint any other other similarly situated business that was not cited for these violations.  Again, the only reference to other businesses on this matter comes from defendants, who identify Life's a Beach and Conscious Point Inn as establishments who were also cited for cesspool violations, and who proffer Williams's testimony that the Town regularly issued improper count citations.  Second, to the extent that plaintiffs claim that they were disparately treated by being referred to the SLA for these minor violations, they provide no evidence of any other business that was issued similar violations, but which was not referred to the SLA.  Plaintiffs' Equal Protection claims related to the cesspool and improper count violations therefore fail.

     *v.   Other Incidents*

The same fate befalls plaintiffs' other allegations of police misconduct in the parking lot of the Diner, *viz.* (1) blocking the entrance and exit of the Diner parking lot during a DWI check, (2) displaying their weapons in the presence of Diner customers, and (3) searching the cars of patrons in the parking lot.  To the extent that plaintiffs' allege these events within the context of their Equal Protection claims, they have not identified any other businesses similarly situated who were treated differently.  Any Equal Protection claims based on these events therefore fail as a matter of law.

### vi. Discretion

As issues of fact remain as to whether plaintiffs were treated differently than similarly situated businesses with regard to their referral to the SLA for change-of-use violations, the discussion moves to the *Enquist* element of their class-of-one claim, namely, whether the disparate treatment resulted from a non-discretionary state action.

The state action at issue here is the defendants' decisions to refer the change-of-use violation to the SLA.  Defendants argue that "plaintiffs are primarily challenging the Southampton defendants' application of local zoning laws [, and that] [z]oning is a classic example of state action that involves discretionary decision-making." (Ds' Memo at 10 (citing *Catcove*, 685 F. Supp. 2d 328).)  The problem with this argument is that it ignores one of plaintiffs' paramount claims – a claim that is also, notably, the only portion of their Equal Protection cause of action that now survives.  Again, the surviving claim is not that defendants misapplied the zoning laws or incorrectly charged plaintiffs with violations of those laws, but that defendants referred these violations to the SLA, without doing so for other businesses that also violated local zoning laws.  A referral to the SLA involves State law and State agencies, not local zoning ordinances.

Plaintiffs argue briefly that the discretion issue here is analogous to *Alfaro*, 2009 U.S. Dist. LEXIS 72532, wherein the Town of Southampton's enforcement of zoning ordinances through the use of a search warrant and a police raid was found to be non-discretionary in that the Town "had *never* exercised that power except against Mr. Alfaro, placing Mr. Alfaro in a class all by himself amongst zoning code violators." *Id.* at *32 (emphasis in original); *see Engquist*, 553 U.S. at 602("What seems to have been significant in *Olech*[, 528 U.S. 562,] and

23

the cases on which it relied was the existence of a clear standard against which departures, even for a single plaintiff, could be readily assessed. There was no indication in *Olech* that the zoning board was exercising discretionary authority based on subjective, individualized determinations.")

In their attempt to extend the findings of *Alfaro* to this case vis-à-vis the discretion element, plaintiffs do not appear to argue that defendants' treatment of their comparators established a clear standard from which defendants later departed in their treatment of plaintiffs. Rather, they argue that defendants applied unspecified "de facto standards" to the plaintiffs themselves. *See* (Pl.'s Memo at 20)("[D]efendants applied 'de facto standards' which employed the use of heavy-handed tactics such as raids; twice daily inspections to enforce its zoning code; bogus and exaggerated violations leading to referrals to the SLA; clear disparate and favorable treatment to similarly situated establishments engaged in similar conduct; and threats to shut down the diner.")  This argument is problematic at best.  The point of establishing that a "de facto standard" existed is to show (1) that the matter is not discretionary, and (2) that the defendants did not apply that same standard to plaintiffs. Here, plaintiffs seem to be arguing that some yet unidentified standard was applied to plaintiffs, not their comparators.

By way of illustration, in *Alfaro*, the plaintiff demonstrated through deposition testimony and other evidence that the Town had "never before" subjected a commercial property to a warrant or a police raid for a zoning violation. *Alfaro*, 2009 U.S. Dist. LEXIS 72532 at *9 n.2. This practice of refraining from exercising such powers in zoning cases established the standard by which the Town would engage alleged zoning violators – a "clear standard" that the Town declined to apply when it later searched and raided the plaintiff's business.

24

Plaintiffs have failed to make such a showing here. The only surviving class-of-one claim at this juncture alleges that plaintiffs were treated differently from two similarly situated businesses. Plaintiffs have not alleged that the Town has "never before" referred a change-of-use violation to the SLA, nor does the treatment of two businesses provide enough evidence for a jury to conclude that a pattern of practice has emerged.

A further review of the record, *sua sponte*, likewise reveals that there is no evidence tending to suggest that defendants were acting without discretion under "clear standards" rather than "subjective, individualized determinations."*See Engquist*, 553 U.S. at 602; *see also Crippen*, 2009 U.S. Dist. LEXIS at *29 ("[I]n *Olech,* the 'class of one' equal protection claim was not that the village had departed from a particular code provision regarding the scope of an easement; rather, . . . [the Village] 'depart[ed] from its *normal policy* . . . .").

For example, at deposition Kraft testified that defendants typically make referrals for "businesses that have repeating problems with change of use or life safety code. Generally life safety is our biggest concern, so blocked exits or things that could cause harm to the occupants are really our biggest concern." (Kraft Dep. at 67.) If anything, this testimony lends itself to the conclusion that a fair amount of discretion was at work in deciding what matters to refer to the SLA. What constitutes "repeating" or "life safety" appears on its face to be largely undefined terminology; neither the line of questioning at deposition, nor other evidence in the record suggests otherwise. To the extent one may argue that Kraft's testimony identifies standards by which referral decisions were made, plaintiffs do not point to any comparators to which the Town previously applied such standards.

25

Kraft also testified to the following:

> Q: When you say we will give information to the State Liquor Authority, what does that mean?
>
> A: It depends on who is working with this in the police department. We'll give the information to the Police Department often and they will make the decision to forward it on.

(Kraft Dep. at 68.)

This testimony suggests that deciding what matters to refer to the SLA is discretionary, so discretionary, in fact, that it depends on which officer in the Police Department happens to be handling the matter on a particular day. Sergeant Kiernan did testify, however, that when a "crime" occurs on the premises, they are "mandated" to make a referral, (Kiernan Dep. at 18.) But looking closely at the record, there is no indication that this "mandate" extends beyond on-premise incidents of crimes to violations of zoning or other local ordinances. In fact, section 106-a of the Alcoholic Beverage Control Law requires only the referral of arrests for a list of enumerated crimes that occur at a licensed business.[21]

Therefore, based on the evidence presently before the Court, there are no issues of material fact as to whether the decision to refer matters to the SLA was a matter of discretion. Defendants are therefore entitled to judgment as a matter of law as to plaintiffs' class-of-one claims.

---

[21] *But see* Declaration of Kelly E. Wright ("The Southampton Town Police Department and indeed all police departments are mandated by the Alcohol Beverage Control Law, to submit referrals regarding *violations and/or crimes* at establishments holding a liquor license to the State Liquor Authority."(emphasis added))

26

### c. Selective Enforcement

As to plaintiffs' selective enforcement claim, district courts in this Circuit have found that the "similarly situated" standard for selective enforcement causes of action is the same as in class-of-one claims. *Camac v. Long Beach City Sch. Dist.*, No. 09 CV 5309, 2011 U.S. Dist. LEXIS 79997, *45 n.9 (E.D.N.Y. July 22, 2011); *Kamholtz v. Yates Cnty.*, No. 08-CV-6210, 2008 U.S. Dist. LEXIS 97985, *16 (W.D.N.Y. Dec. 3, 2008), *aff'd* 350 Fed. Appx 589 (2d Cir. 2009); *Dones v. City of New York*, No. 07 Civ. 3085, 2008 U.S. Dist. LEXIS 53681, *28 (S.D.N.Y. July 9, 2008). This Court also adopts such an approach. Therefore, as plaintiffs have only established the existence of similarly situated businesses regarding the referral of their change-of-use violation to the SLA, the Court will cabin its discussion of selective enforcement solely to that referral.

Plaintiffs allege that defendants "singled out the plaintiffs' restaurant for such advantageous treatment of both coercion and punishment, because of the plaintiffs' exercise of their rights to cater to Hispanic and Latino customers." (Compl. ¶ 272.) According to the complaint, the disparate treatment was based on "racial animus . . . in a deliberate attempt to compel or encourage racial segregation." (Compl. ¶ 273.) Plaintiffs' evidence of racial animus resides primarily in the timing of events. The Diner began offering its customers a DJ playing "Hispanic" music in early 2006. Shortly thereafter, and as early as May 7, 2006, defendants began to cite the Diner for various infractions that would later be referred to the SLA. Never before, since it opened in 1983, had the Diner been cited for such violations. Though the defendants never made any specific references directly to the plaintiffs regarding the ethnicity of their customers, plaintiffs note that defendants unnecessarily note in their incident reports the

ethnicity of the patrons or that "Hispanic music" was playing during the nights that the police raided the rear area of the Diner.  Further, plaintiffs cite to acts that are not a part of their Equal Protection claims, such as the "blockade" of the parking lot, the brandishing of weapons, and undercover drug investigations, which, they assert demonstrate a dramatically changed relationship with the Town police officers and officials after they began offering Hispanic nights.

Defendants counter that the citations began not because the composition of Diner's night-time customers changed, but because the nature of the business changed.  When it was only a Diner, for example, there was no occasion to cite the establishment for a "change of use" violation.  And Sergeant Kiernan testified that he regularly conducted undercover drug buying operations at establishments for no other reason than the fact that they are nightclubs.  According to him, in his experience, "where there is a nightclub, there are drugs." (Kiernan Dep. at 39.) According to Mr. Vlahadamis's testimony, however, in the years prior, before the restaurant specifically targeted Hispanic patrons, "there were a lot more people in the restaurant [with] lines around the building and we never had police presence there, ever." (FV Dep. at 63-64.)

The present record contains enough evidence for a reasonable jury to find that the timing and nature of the referrals creates a sufficient inference that defendants singled plaintiffs out for impermissible considerations.  A reasonable jury of course could also very well conclude that the defendants' referrals to the SLA were appropriate and not based on any form of racial animus. Nevertheless, material issues of fact exist to preclude the award of summary judgment as to plaintiffs' claim for selective enforcement through the referral of the change-of-use violations to the SLA.  All other selective enforcement claims are hereby dismissed.

28

### d. Personal Involvement

"It is well-settled in [the Second Circuit] that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Middleton v. City of New York*, No. 04-CV-1304, 2006 U.S. Dist. LEXIS 44320 (E.D.N.Y. June 19, 2006) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)) (internal quotation marks omitted, alteration in the original).  Moreover, "a defendant in a § 1983 action may not be held liable for damages for constitutional violations merely because he held a high position of authority." *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996).

As to plaintiffs' surviving Equal Protection claims, the only defendants who are even remotely involved with the referral of change-of-use violations to the SLA – so far as the record is concerned – are Stephen Frano, James Kiernan, and Cheryl Kraft.  One of the complications in determining who is responsible for issuing such referrals is that the referral form itself does not require the name or signature of the submitting Town official; it merely requires the names of the officers involved in witnessing the underlying violation, and the particular Town department involved.  The referral in question lists "The Southampton Town Fire Marshal's Office" as the issuer. (Ps' Ex. R.)  Evidence of personal involvement here, therefore, derives almost entirely from deposition testimony.

Testimony from both Stephen Frano and Cheryl Kraft, suggest that Frano, as a Town code enforcement officer, took some responsibility generally for deciding what code and zoning violations should be referred to the SLA, and for deciding to refer the particular violations issued to plaintiffs.  Some of his decisionmaking, however, appears to either be referred to, or shared with Kiernan in the Police Department.  The following excerpts from Frano's deposition outline

29

the contours of their cooperation.

> Q: What led you to believe that you needed copies of the violations from the evening in question to submit to the SLA?
>
> A: The discussion with the Police Department.
>
> Q: With whom, from the Police Department, did you have a discussion with, which led you to believe that the complaints prepared for this evening's visit to the Hampton Bays Diner were going to be referred to the [SLA]?
>
> A: If I recall, James Kiernan.
>
> Q: Can you tell me the sum and substance of any conversation you had with Mr. Kiernan in that regard?
>
> A: General conversations as to the violations that were taking place at the diner.
>
> Q: What was said by him and what was said by you . . .
>
> A: Just general conversations as to what the violations were, what we observed, what we found that was there.
>
> Q: During that conversation, did either you or he determine that the complaints should be referred to the [SLA]?
>
> A: I believe Mr. Kiernan had said, why don't we make a referral to the SLA?
>
> . . .
>
> Q: Was this a typical conversation that you had, with regard to violations issued to an establishment, with Mr. Kiernan?
>
> A: Yes.

(Frano Dep. at 63-64.)

> Q: Mr. Frano, did there come a time that you learned that, in fact, the Town of Southampton had issued a referral to the [SLA] for, among other things, the change of use violation, which was issued

to the Hampton Bays Diner in connection with your visit on the evening we discussed, which was May 20th, 2007?

A: Yes.

(Frano Dep. at 84.)

These excerpts suggest that (1) Frano was likely the one who actually submitted the referral to the SLA (*See id* at 63 ("Q: What led you to believe that you needed copies of the violations from the evening in question *to submit to the SLA*?")), and (2) there was some collaboration with Kiernan in deciding whether to refer the matter. Kraft's testimony tends to support this interpretation of the facts.

Q: As you sit here today, are you aware of any referrals issued by the Town, at any time in 2007 or any time thereafter, to the [SLA] for Buckley's Inn Between?

A: No, as I testified, Steve Frano handled most of that. I didn't see it.

(Kraft Dep. at 81.)

. . .

Q: Do you know of any reason why [the Town] would send a referral to the SLA the identical violation for Hampton Bays Diner?

A: Again, I didn't make the determination of what was filed.

Q: Do you know who did?

A: In general, it was Steve Frano.

(Kraft Dep. 118-19.)

We look next to Kiernan's testimony:

Q: . . . [W]as there ever an occasion upon which a police officer, under your direct supervision, made an arrest for criminal activity

31

> inside an establishment and you did not affirmatively direct them to send a referral to the [SLA]?
>
> A: Sure.
>
> Q: Why?
>
> A: They usually do it on their own. I'm not, you know – they usually handle those things on their own.
>
> Q: You have to sign the referral, don't you?
>
> A: Right.

(Kiernan Dep. at 78.)

Kiernan's testimony makes clear that he has some form of final decisionmaking authority for referrals out of his office. His testimony, however, only discusses referrals for criminal activity, suggesting that crimes and arrests represent the full extent of his involvement in SLA referrals. However, Cheryl Kraft, the Town's Chief Fire Marshal – whose testimony presumably discusses only the types of referrals that come out of her department (i.e. code and safety violations) – states that they referred such matters to the Police Department, which "make[s] the decision to forward it on." (Kraft Dep. at 68.)  Also, as discussed above, Frano clearly discussed the matter of referring the Diner's lesser code and zoning violation with Kiernan. There is therefore sufficient evidence for a rational jury to find that both Kiernan and Frano were personally involved in the SLA referrals in question.

As to Kraft, although she supervises Frano, her testimony demonstrates that Frano handled the matter of SLA referrals for her department. Other than her supervisory role, there is no evidence in the record of her personal involvement in the SLA referrals, and merely holding a

32

position of responsibility is insufficient to impose liability under § 1983. *Black v. Coughlin*, 76

F.3d 72, 74 (2d Cir. 1996) (citations omitted). Rather, the personal involvement of a supervisory

defendant may be shown by evidence that; (1) the defendant participated directly in the alleged

constitutional violation, (2) the defendant, after being informed of the violation through a report

or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which

unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4)

the defendant was grossly negligent in supervising subordinates who committed the wrongful

acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information

indicating that unconstitutional acts were occurring. *Colon v. Coughlin*, 58 F.3d 865, 874 (2d

Cir. 1995) (citations omitted); *but cf. Sash v. United States*, 674 F. Supp. 2d 531, 543 (S.D.N.Y.

2009) (noting that the Supreme Court's decision in *Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937

(2009), may have effectively nullified several categories of supervisor liability enunciated in

*Colon*).  Here, there is an absence of any specific evidentiary support for Kraft's personal

involvement – supervisory or otherwise – in the referral of plaintiffs' zoning violation to the

SLA; the equal protection claims against her are therefore dismissed.

Similarly, there is no evidence whatsoever that the other individual defendants were

personally involved in the SLA referral. Therefore, all equal protection claims against defendants

Cagno, Hansen, Williams, and John Does 1-7 are likewise dismissed.

### e.  *Monell* **Liability**

A municipality may not be held liable under Section 1983 on a *respondeat superior*

theory of liability for its employees' alleged constitutional violations. *See Monell v. N.Y. City*

*Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir.

1995). A municipal entity may only be liable if the alleged conduct was undertaken pursuant to

"a policy statement, ordinance, regulation, or decision officially adopted and promulgated by

[its] officers" or a "governmental 'custom' even though such a custom has not received formal

approval through [ ] official decisionmaking channels." *Monell*, 436 U.S. at 690-91.

Accordingly, in order to bring a Section 1983 claim against a municipal defendant, a plaintiff

must establish both a violation of his constitutional rights and that the violation was motivated by

a municipal custom or policy. *Id.*; *see also Coon v. Town of Springfield, Vt.*, 404 F.3d 683, 686

(2d Cir. 2005) ("[I]t is when execution of a government's policy or custom, whether made by its

lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts

the injury that the government as an entity is responsible under § 1983.").

 The existence of a municipal policy or custom may be demonstrated in any of the

following four ways. A plaintiff may show that his constitutional injuries arose from: "(1) the

existence of a formal policy officially endorsed by the municipality; (2) actions taken or

decisions made by municipal officials with final decision making authority, which caused the

alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it

constitutes a custom of which constructive knowledge can be implied on the part of the

policymaking officials; or (4) a failure by policymakers to properly train or supervise their

subordinates, amounting to 'deliberate indifference' to the rights of those who come in contact

with the municipal employees." *Williams v. City of Mt. Vernon*, 428 F. Supp. 2d 146, 159

(S.D.N.Y. 2006) (citing *Moray v. City of Yonkers*, 924 F. Supp. 8, 12 (S.D.N.Y. 1996)); *see also*

*Bonds v. Suffolk Cnty. Sheriff's Dep't*, No. 05 CV 3109, 2006 U.S. Dist. LEXIS 93607, *5

(E.D.N.Y. Dec. 5, 2006) (same); *Peterson v. Tomaselli*, No. 02 Civ. 6325, 2004 U.S. Dist. LEXIS 19765, *26 (S.D.N.Y. Sept. 30, 2004) (same).

Plaintiffs name both the Town of Southampton and the Southampton Town Police Department[22] in this action.  As discussed in more detail in the preceding subsection, there are questions of fact as to whether Frano and/or Kiernan were had final decisionmaking authority regarding referrals to the SLA.  If either or both have such authority, and if either or both actually referred the violations to the SLA – a separate matter for the jury – then there is a legal basis for municipal liability in this case.[23]  The municipal defendants are therefore not entitled to summary judgment at this juncture on the surviving Equal Protection claims.

## IV.   DUE PROCESS

In order to succeed on a due process claim, whether procedural or substantive, plaintiffs must identify a valid liberty or property interest.  *Toussie v. County of Suffolk*, No. 01-CV-6716(JS), 2011 U.S. Dist. LEXIS 84915, *36 (E.D.N.Y. Aug. 2, 2011)(citing *Local 342, Pub. Serv. Emps. v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994) and *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 503 (2d Cir. 2001)).

Plaintiffs' Complaint claims violations of both procedural and substantive due process, identifying a number of rights and vested interests denied by defendants, including their First Amendment right to association. (Compl. Counts 1-2.)  However, in their opposition to

---

[22] Defendants do not indicate in their motion whether the Southampton Police Department is a suable entity under the Town charter. *See Yonkers Com. on Human Rights v. Yonkers*, 654 F. Supp. 544, 551 (S.D.N.Y. 1987); *see also* Fed. R. Civ. P. 17(b)(The capacity of a party to be sued is "determined by the law of the state in which the district is held").

[23] Liability against the Police Department would hinge on Kiernan's authority for and involvement with the SLA referrals, as Kiernan, and not Frano, works for the Police Department.

defendants' motion, they identify only their right to "pursue the operation of their restaurant free of racial discrimination, racial segregation and to be free of actions . . . to punish them for serving customers of any race or origin . . . ."[24](Ps' Memo at 23.)  They locate this interest within their larger right to "follow their chosen business and profession free from arbitrary and unreasonable governmental interference." (Ps' Memo at 22 (citing cases).)

There is a well-established liberty interest in "engag[ing] in any of the common occupations of life." *Donato v. Plainview-Old Bethpage Cent. Sch. Dist.*, 96 F.3d 623, 632 (2d Cir. 1996) (quoting *Meyer v. Nebraska*, 262 U.S. 390, 399(1923)).  However, most courts in this Circuit have held that one may prevail on such a claim only where he or she is stripped entirely of his or her opportunity to participate in a given field of occupation.  *Toussie*, 2011 U.S. Dist. LEXIS 84915 at *37-*38 (collecting cases); *Schultz v. Inc. Vill. of Bellport*, 2010 U.S. Dist. LEXIS 104804 (E.D.N.Y. Sept. 30, 2010)(holding that there was no evidence that defendants acts prevented plaintiff from participating at all in the "coffee shop business"); *Rodriguez v. Margotta*, 71 F. Supp. 2d 289, 296 (S.D.N.Y. 1999) ("It is well settled that one must have no ability to practice one's profession at all in order to state a claim for deprivation of a liberty interest.")

Plaintiffs here allege that they have been forced to stop holding "Hispanic Nights" at the Diner. (Compl. ¶¶ 209-10.)  They do not allege that they have been deprived of the opportunity to participate in the restaurant/bar business altogether, nor do they even claim that they have otherwise been prevented from continuing to operate the Diner.  Therefore, no issues of fact exist as to whether plaintiffs were deprived of the asserted liberty interest to pursue their chosen

---

[24] Specifically, plaintiffs' memorandum no longer asserts any First Amendment rights within their due process claim.

occupation.  Defendants' motion for summary judgment as to plaintiffs' substantive and procedural due process claims are therefore granted.


V.   **CONSPIRACY**

Next, plaintiffs allege that "each and all of the defendants conspired with and among each other in order to violate plaintiffs' rights." (Compl. ¶ 337.)  To succeed on a conspiracy cause of action under 42 U.S.C. §1985(3),  plaintiff must show: "(1) a conspiracy; (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States." *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999); see also *Traggis v. St. Barbara's Greek Orthodox Church*, 851 F.2d 584, 586-87 (2d Cir. 1988).  Further, "[t]here must be some racial or perhaps otherwise class-based invidiously discriminatory animus behind the conspirator's action." *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971); *see Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999); *Gagliardi v. Village of Pawling*, 18 F.3d 188, (2d Cir. 1994).

Defendants move to dismiss the conspiracy claim on the ground that it is barred by the intracorporate, or intra-enterprise, conspiracy doctrine because the individual defendants are all employed by the same institutional entity.  Under the doctrine, officers, agents and employees of a single corporate or municipal entity, each acting within the scope of his or her employment, are legally incapable of conspiring together.  *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978) ("[T]here is no conspiracy [under section 1985] if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own . . . officers[

37

and employees, each acting within the scope of his employment."); *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66, 71 (2d Cir. 1976); *Nassau County Employee "L" v. County of Nassau*, 345 F. Supp. 2d 293, 304-05 (E.D.N.Y. 2004); *Everson v. N. Y. City Transit Auth.*, 216 F. Supp. 2d 71, 76 (E.D.N.Y. 2002) (doctrine includes allegations of conspiratorial conduct between a public entity and its employees; *Quinn v. Nassau County Police Dep't*, 53 F. Supp. 2d 347, 359 (E.D.N.Y. 1999).

Here, all of the individual defendants are employees of the same entity: the Town of Southampton.  It matters not that they hail from different departments within the Town's governing structure; they are still covered by the doctrine and therefore any claims that they conspired amongst themselves necessarily fails. *See Dunlop v. City of New York*, No. 06 Civ. 0433, 2008 U.S. Dist. LEXIS 38250 (S.D.N.Y. May 6, 2008)(applying the intracorporate conspiracy doctrine to conspiracy claims involving the New York City Police Commissioner, two Deputy Police Chiefs, the Mayor, and the City of New York.);  *McEvoy v. Spencer*, 49 F. Supp. 2d 224, 226 (S.D.N.Y. 1999) (Although all defendants "work[ed] in different departments of the City, [ ] that is of no more moment in the municipal context than it would be if the individual defendants worked for the Mainframe and Personnel Divisions of IBM and were accused of conspiring with their employer corporation to discriminate against another employee.")

Nevertheless, before this motion was filed, the plaintiffs discontinued their claims against the New York State Division of Alcohol Beverage Control and "John Does 8 & 9," who were identified in the Complaint as "employees of the [Alcohol Beverage Control Division]." (*See* Docket No. 30; Compl. ¶ 17.)  But at the time that the Complaint was filed, the "defendants"

38

referred to in the conspiracy count included the Alcohol Beverage Control Division and the two John Doe employees (collectively "State defendants"). Although the claims against the State defendants have been withdrawn, any claims against the Town defendants for conspiring with the State defendants would nevertheless remain. Further, as these two sets of defendants are employed by different entities, the intracorporate conspiracy doctrine would not apply.

In support of this claim, plaintiffs point out that during the raid of the Diner on May 25, 2008, Sergeant Kiernan was accompanied by two investigators from the SLA: John Does 8 and 9. (Kiernan Dep. at 135-36; Compl. ¶ 17.) Plaintiffs also note that these investigators would not have joined the investigation had it not been for Kiernan's telephone call to the SLA to request their assistance (Kiernan Dep. 135-36). Plaintiffs further point to a log entry from one of the two SLA investigators on duty that night, which includes the notation "Latin clientele." (Ps' Ex. BB.)

A conspiracy "need not be shown by proof of an explicit agreement but can be established by showing that the 'parties have a tacit understanding to carry out the prohibited conduct.'" *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995) (quoting *United States v. Rubin*, 844 F.2d 979, 984 (2d Cir. 1988)). Here, plaintiffs provide evidence that the alleged conspirators communicated prior to entering into a joint investigation wherein, plaintiffs claim, Mr. Vlahadamis was "forced" by an SLA investigator to sign a written confession to violations that may affect the status of the Diner's liquor license.

It is worthy of reminder here that the only allegation of a constitutional violation that survives as this juncture is the deprivation of plaintiffs' Equal Protection rights vis-à-vis the referral of the change-of-use violation to the SLA. The equal protection claim pertaining to the issuance of that underlying violation has been dismissed. The conspiracy claim here, however,

39

does not directly implicate the SLA referral. Rather, it implicates the investigation by the police and the SLA that led to the citation for the underlying change-of-use violation. This disconnect, however, does not vitiate plaintiffs' conspiracy claim. The underlying violation is the subject of the referral at issue, and part and parcel of the remaining constitutional violation alleged by plaintiffs. Therefore, although the alleged conspiracy may not have been an agreement to single out plaintiffs through a referral to the SLA specifically, it did provide a necessary component to the overarching violation.

Plaintiffs must also demonstrate some "invidiously discriminatory animus" behind defendants' action. The investigator's reference to "Latin clientele," however, does not pass muster in that regard. As discussed earlier, the conspiracy charge is against the Town defendants, not the SLA investigators. Although the reference may bear some relevance to the motivations of the State defendants, it does not shed any light on the Town defendants' state of mind. Nevertheless, the timing of the investigation in relation to the plaintiffs' commencement of Hispanic nights at the Diner raises issues of fact regarding the presence of any discriminatory animus. Whether the events in question are, for example, close enough in time to suggest such motivations were present is a question for a jury.

The record, however, only provides evidence that Kiernan may have been involved in the conspiracy. No evidence exists that the other individuals were personally involved. Therefore the conspiracy claim may move forward as against defendant Kiernan, but is dismissed as to all other defendants.

40

## VI.   MALICIOUS PROSECUTION

Plaintiffs' final cause of action alleges malicious prosecution for what they portray as "quasi criminal" proceedings before the SLA. (Compl. ¶ 350.)  However, despite plaintiffs' characterization of the proceedings, they were never arrested or charged with a crime.  Plaintiffs were merely subjected to civil administrative proceedings before a State agency.  Malicious prosecution claims do not exist in the context of civil administrative proceedings where plaintiffs "were never taken into custody, imprisoned, physically detained or seized within the traditional meaning of the Fourth Amendment." *Washington v. County of Rockland*, 373 F.3d 310 (2d Cir. 2004).  Defendants are therefore entitled to summary judgment on plaintiffs' malicious prosecution claim.


## VII.   RIPENESS

Defendants assert that plaintiffs' claims are not yet ripe for adjudication, because they "never attempted to obtain a variance or special use exemption to operate the Diner as a nightclub," and therefore have not obtained a final decision. (Ds' Memo, Point I.)  Article III of the Constitution requires that all cases or controversies be ripe for judicial review. *Sunrise Dev., Inc. v. Town of Huntington*, 62 F. Supp. 2d 762, 770 (E.D.N.Y. 1999) ("In the area of land use, the doctrine of ripeness is intended to avoid premature adjudication of administrative action.") To determine whether a case is ripe for review, a court is "generally require[d]" to "'evaluate both the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration.'" *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342 (2d Cir. 2005) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

41

The only remaining claims in this case, however, do not involve the underlying change-of-use zoning violation, but rather the defendants' choice to refer such matter to the SLA. There is no further adjudication available at the state or local level to challenge the defendants' decision in that regard. Defendants' argument that plaintiffs' surviving claims are not ripe is therefore without merit.

## VIII.   QUALIFIED IMMUNITY

The individual defendants maintain that they are entitled to summary judgment on the basis of qualified immunity. "Government actors have qualified immunity to § 1983 claims 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Bolmer v. Oliveira*, 594 F.3d 134, 141 (2d Cir. 2010) (quoting *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 432 (2d Cir. 2009)). Thus, "[a] qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996).

"Qualified immunity shields government officials from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits." *Lennon v. Miller*, 66 F.3d 416, 420 (2d Cir. 1995). A court may grant summary judgment on qualified immunity grounds "if [the movant] adduces sufficient facts such that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the [movant] to believe that he was acting in a fashion

42

that did not clearly violate an established federally protected right." *Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008) (internal quotations omitted). Qualified immunity is an affirmative defense. As such, the burden of proof rests on the defendants asserting the defense to demonstrate that it was objectively reasonable to believe that their conduct did violate a federal right of Plaintiffs. *See Green v. City of New York*, 465 F.3d 65, 83 (2d Cir. 2006).

Genuine issues of fact remain at this stage regarding plaintiffs' claims, particularly whether there was an agreement between Kiernan and other individuals regarding a conspiracy to violate plaintiffs' rights, and whether the alleged equal protection and conspiracy violations were motivated by impermissible considerations. As such, the genuine issues of material fact that preclude an award of summary judgment on plaintiffs' equal protection and conspiracy claims likewise preclude granting the remaining individual defendants qualified immunity at this juncture. *See Cobb v. Pozzi*, 363 F.3d 89, 111-112 (2d Cir. 2003) ("The issue of rational treatment is not sufficiently different from the issue of whether the defendants acted in an 'objectively reasonable' manner so as to lead us to resolve the latter issue as a matter of law where we have concluded in the face of disputed issues of fact that the jury must resolve the former issue.")(citation omitted). The remaining defendants are not therefore entitled to summary judgment under qualified immunity.

## CONCLUSION

For the reasons stated above, plaintiffs' selective enforcement Equal Protection claims regarding the referral of their change-of-use violation to the SLA, and their conspiracy claims may proceed to trial only as against defendants Frano, Kiernan, the Town of Southampton and

43

the Southampton Town Police.  Summary judgment is awarded to defendants on all other claims,

which are hereby dismissed.

SO ORDERED.


Dated: Central Islip, New York
          September 28, 2011


                                    _____/s_____
                                    Denis R. Hurley
                                    Senior District Judge

44