UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
FRANK VLAHADAMIS, MARIA VLAHADAMIS,
and HAMPTON BAYS DINER CORP.,

                Plaintiffs,

   -against-                             **MEMORANDUM & ORDER**
                                                        08 CV 2876 (DRH) (AKT)

JAMES KIERNAN, STEPHEN A. FRANO,
and THE TOWN OF SOUTHAMPTON,

                Defendants.
----------------------------------------------------------------X

**APPEARANCES**:

**CAMPANELLI & ASSOCIATES, P.C.**
Attorneys for Plaintiffs
1757 Merrick Avenue, Suite 204
Merrick, NY 11556
By:    Andrew J. Campanelli, Esq.
          David Antwork, Esq.

**DEVITT SPELLMAN BARRETT, LLP**
Attorneys for Defendants
50 Route 111
Smithtown, New York 11787
By:    Jeltje deJong, Esq.


**HURLEY, Senior District Judge:**

       Frank and Maria Vlahadamis and their business Hampton Bays Diner Corp. (the "Diner")

(collectively, "plaintiffs") brought this action alleging, *inter alia*, that James Kiernan

("Kiernan"), Stephen Frano ("Frano"), and the Town of Southampton (the "Town") (collectively,

"defendants") violated their Fourteenth Amendment equal protection rights when they referred a

change of use violation to the State Liquor Authority ("SLA") (the "selective enforcement

claim"),[1] and that defendant Kiernan conspired with others at the SLA to violate their civil rights.[2] The case was tried before a jury over a period of eleven days, at the conclusion of which the jury returned a verdict in favor of defendant Kiernan as to plaintiffs' selective enforcement claim but was otherwise unable to reach unanimity.

Upon completion of the plaintiffs' case-in-chief, defendants sought judgment as a matter of law under Rule 50(a), with decision being reserved. That motion – which is the subject of this Memorandum and Order – was timely renewed pursuant to Rule 50(b) following receipt of the jury's partial verdict. The motion targets those claims the jury did not decide, namely plaintiffs' selective enforcement claim against defendants Frano and the Town,[3] and plaintiffs' conspiracy claim against defendant Kiernan. For the reasons that follow, the motion is GRANTED in part, and DENIED in part.

---

[1] Following an inspection of the Diner on May 20, 2007, plaintiff Frank Vlahadamis was charged by Frano on May 26, 2007 with a change of use violation for operating a nightclub without the appropriate certificate of occupancy. (*See* Pls.' Trial Ex. 14; *see also* Pls.' Trial Ex. 39 (the Town of Southampton Zoning Law's definition of "NIGHTCLUB or CABARET" in Art. I, § 330-5).) The change of use violation was, in turn, sent by Frano to the SLA on June 20, 2007. (*See* DeJong Decl., Ex. B. (Trial Transcript (hereafter, "Tr.") at 748:24-750:25.)

[2] As will be discussed *infra*, other defendants and claims were dismissed at various points throughout the litigation.

[3] Sometimes defendants refer to the selective enforcement claim in the singular, (Defs.' Mem. at 1), and other times as the selective enforcement claims, (*id.* at 3.) Couching the cause of action in the singular is consistent with the fact that only one selective enforcement claim was placed before the jury, viz. the one predicated on the change of use violation issued to plaintiff Frank Vlahadamis which was referred to the SLA. But that one claim was asserted against more than one defendant, thus giving rise to the occasional use by the defendants of the term "claims" in referring to the lone selective enforcement cause of action.

## BACKGROUND

On July 18, 2008, plaintiffs filed their Complaint against Kiernan, Frano, the Town, Vincent Cagno, Cheryl Kraft, Chris Hansen, Brian Williams, the Southampton Town Police Department, the New York State Division of Alcohol Beverage Control and "John Does" and/or "Jane Does" #1-9 for alleged violations of their equal protection and due process rights as well as for malicious prosecution and conspiracy. Plaintiffs contend that the defendants launched a series of attacks upon the plaintiffs with the intent to prevent them from continuing to draw Hispanics into their restaurant and to punish them for doing so in the first instance. According to plaintiffs, these attacks included multiple raids of the Diner and the concomitant issuance of bogus state and local law violations which were then referred to the SLA in an attempt to have plaintiffs' liquor license revoked.

By Stipulation dated October 21, 2009, plaintiffs voluntarily discontinued this action against the New York State Division of Alcohol Beverage Control and John Does #8 and #9. Then, on May 25, 2010, the remaining defendants moved for summary judgment on all claims. By Memorandum and Order dated September 28, 2011, that motion was granted in part, with the surviving causes of action being: (1) plaintiffs' selective enforcement claim as against Kiernan, Frano and the Town based on the defendants' referral of plaintiffs' change of use violation to the SLA;[4] and (2) plaintiffs' conspiracy claim based on the May 25, 2008 "raid" of the Diner as against Kiernan. *See Valhadamis v. Kiernan*, 837 F. Supp. 2d 131, 160 (E.D.N.Y.) Those two claims, as noted earlier, were the ones presented to the jury.

---

[4] On February 10, 2012, the Court granted defendants' unopposed motion *in limine* which requested that the Southampton Town Police Department be dismissed as a named party.

## DISCUSSION

I.   *Applicable Standard - Rule 50 Motion*

A Rule 50 motion "may only be granted if . . . the evidence in favor of the movant is so overwhelming that reasonable and fair-minded [persons] could not have arrived at a verdict against [it]." *Brady v. Wal-Mart Stores, Inc.*, 531 F.3d 127, 133 (2d Cir. 2008) (alterations in original) (internal quotation marks and citation omitted); *accord Kinneary v. City of New York*, 601 F.3d 151, 155 (2d Cir. 2010). In considering the motion, a court "may not weigh the credibility of witnesses or otherwise consider the weight of the evidence." *Caruolo v. John Crane Inc.*, 226 F.3d 46, 51 (2d Cir. 2000); *see also This is Me, Inc. v. Taylor*, 157 F.3d 139, 142 (2d Cir. 1998) (The issue on a Rule 50 motion is whether "the evidence is such that, without weighing the credibility of witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached.") (internal quotation marks and citation omitted).

II.   *Selective Enforcement Claim*

A plaintiff must meet the following two-pronged test in order to establish a selective enforcement equal protection claim: "(1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980); *accord La Trieste Rest. & Cabaret v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994). With regard to the selective enforcement claim still pending against Frano and the Town, defendants maintain that plaintiffs' proof at trial was inadequate as a matter of law

to establish (1) that either Buckley's Inn Between ("Buckley's") or Tide Runners was similarly situated to the Diner and (2) that the referral to the SLA was (a) selective or (b) motivated by racial animus.

Before addressing defendants' arguments, it is important to stress, at the outset, the limited scope of plaintiffs' equal protection claim which survived summary judgment. The only basis for liability as to that claim involves defendants' referral of plaintiffs' change of use violation to the SLA.[5] The Court previously dismissed plaintiffs' equal protection claims based on the Town's *issuance* of three change of use violations to the plaintiffs. Therefore, any argument proffered by either party which relates to the issuance of change of use violations is immaterial to the present motion and will be identified as such.

### A.     *Similarly Situated Element of Selective Enforcement Claim*

"A selective enforcement claim requires, as a threshold matter, a showing that the plaintiff was treated differently compared to others similarly situated." *Church of the Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 210 (2d Cir. 2004). Such a showing requires an extremely high degree of similarity between the plaintiff and the claimed comparators. *See Kamholtz v. Yates Cnty.*, 2008 WL 5114964, at *5 (W.D.N.Y. Dec. 3, 2008), *aff'd* 350 F. App'x 589 (2d Cir. 2009).

---

[5] Plaintiff Frank Vlahadamis was issued a change of use violation on three separate occasions. (*See* DeJong Decl., Exs. C-E.) It is undisputed that the referral to the SLA did not occur until after the third violation was issued. (*See* Defs.' Mem. at 5; Pls.' Mem. in Opp'n at 6.) Plaintiffs indicate, and the Court accepts for present purposes absent an independent review of the trial record as to the issue, that only "one [of the change of use violations] was referred to the State Liquor Authority" at that time rather than all three as a package. (Pls.' Mem. in Opp'n at 6.)

### *1.*     *"Similarly Situated" Standard Utilized by Court*

In this case, the Court previously indicated that it was adopting the approach of those district courts in the Circuit which have found that the "similarly situated" standard for selective enforcement causes of action is the same as for class-of-one claims. *Vlahadamis v. Kiernan*, 837 F. Supp. 2d 131, 151 (E.D.N.Y. 2011) (citing cases); *but see Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 693-97 (S.D.N.Y. 2011) (analyzing split in the Circuit over the similarly situated standard for selective enforcement claims and applying the less stringent "similarly situated in all material respects" test rather than the standard used for class-of-one claims ). Therefore, applying the same "similarly situated" standard as class-of-one cases requires a showing by plaintiffs that "(i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (internal quotation marks and citation omitted); *see also Neilson v. D'Angelis*, 409 F.3d 100, 104 (2d Cir. 2005), *overruled on other grounds by Appel v. Spiridon*, 531 F.3d 138 (2d Cir. 2008) (finding that "the level of similarity between plaintiffs and the persons with whom they compare themselves must be extremely high").

### 2. Positions of Parties and Court's Identification of the Relevant Threshold Inquiry as Being the Referral of the Change of Use Violation to the SLA, Not Its Issuance

Plaintiffs compare the Diner to two other establishments located in the Town that received change of use violations, namely Buckley's and Tide Runners (hereafter, the "comparators"). Notwithstanding that commonality, defendants contend that differing circumstances resulted in only the Diner's violation being referred to the SLA. In particular, the defendants highlight the fact that the Diner received three change of use violations before being referred to the SLA, while each of the comparators was issued only one change of use violation. Defendants further differentiate the Diner from the comparators in that the comparators tried to remedy the problem via applications to the Zoning Board of Appeals ("ZBA") after receiving their change of use violations while the Diner took no such action. In addition, defendants underscore trial testimony suggesting that the type of activities which led to change of use violations being issued to Buckley's and Tide Runners – supposedly unlike the scenario vis-a-vis the Diner – were "pre-existing" and thus presumably not actionable.[6] (Defs.' Mem. at 9.)

Plaintiffs attempt to counter these differences by pointing to evidence indicating that all three establishments played music, had DJs, conducted private parties, had dancing, and employed security personnel. While such factors would be germane in showing similarities between the establishments in receiving the change of use violations in the first instance, the

---

[6] As explained by Ordinance Enforcement Officer Frano a preexisting use "is a use of a piece of property that has been in use prior to a law being enacted that [would otherwise] govern that property and . . . that use is considered preexisting and [is] allowed to continue." (Tr. at 839:20-840:1.) Notwithstanding the supposed preexisting status of Buckley's, its owner, Mark Shorthall, resolved the charged change of use violation by paying a fine, after, he "believe[s]," having entered a guilty plea. (*Id.* at 997:20-21.)

surviving equal protection claim is not based, however, on the issuance of the change of use violations, but rather on their referral or non-referral to the SLA. The relevant threshold inquiry for present purposes, therefore, calls for the identification of the factors which would be likely to trigger a change of use violation, once issued, being sent to that agency. Such information is a prerequisite to determining whether the Diner, Buckley's and Tide Runners were similarly situated. Defendants insist that the evidence at trial permits only one reasonable answer to that question, namely that plaintiffs' proffered comparators may not be legitimately labeled as such.

### *3. Synopsis of Testimony of Kraft, Frano and Kiernan Regarding Referrals to the SLA and Concomitant Issues of Material Fact*

In advancing their argument, defendants place considerable stock in the testimony of Cheryl Kraft ("Kraft"), the Chief Fire Marshal for the Town of Southampton. Kraft testified that referrals to the SLA were made for life and safety issues as well as for "repeating problems," and further indicated that a referral would be more likely if the violator did not seek after-the-fact approval from the ZBA for the cited code violation. (Tr. at 1335:4-5, 1340:16-19, 1371:24-1372:19.)

The above references to Kraft's testimony – viewed in conjunction with the evidence that, unlike the Diner, both Buckley's and Tide Runners each received only one change of use violation and, as to that violation, promptly applied to the ZBA – tend to support defendants' position. However, such testimony may not be considered in isolation. Kraft further testified that she assigned "the task of handling referrals to the New York State Liquor Authority to Steve Frano," absent any instructions or policy statements as to how that task should be performed. (Tr. at 1333:2-7.) The thrust of her testimony was that Frano basically had carte blanche in deciding which change of use violations to refer to the SLA, although she has some general,

8

albeit not specific knowledge concerning the subject.  (*Id.* at 1340:6-22.)  To the extent that Kiernan, or another member or members of the Southampton Police Department may have played a role in referring violations to the SLA, Kraft disclaimed any knowledge one way or the other.  (*Id.* at 1339:21-25.)

In sum, Kraft's testimony lends itself to more than one sensible interpretation.  On the one hand, a finding could be made by the trier-of-fact that her testimony as the Chief Fire Marshal about her general knowledge vis-a-vis referrals to the SLA dovetailed with the reality of the situation in that repeat offenders who did not seek to remedy the nonconforming use by an application to the ZBA were prime candidates for a referral.  Such a conclusion would eviscerate plaintiffs' reliance on Buckley's and Tide Runners as comparators for equal protection purposes.  However, a contrary conclusion would also be within the range of reasonableness.  A jury might well conclude that Kraft, notwithstanding her title, was essentially oblivious to the factors influencing referrals to the SLA, given the unfettered transfer of her authority over the subject area to Frano.  Which of the above interpretations, or other view of Kraft's testimony is appropriate, is for a jury to decide.

Frano's testimony largely mirrored Kraft's insofar as it confirms that he was the town employee responsible for change of use violations being sent to the SLA.  In that regard, in response to the question "what led you to believe that you needed . . . to submit . . . violations to the New York State Liquor Authority for town code violations" (Tr. at 776:3-5), he testified that it was "part of the town board's initiative that they wanted us . . . to enforce all the laws [with respect to nightclubs] we possibly could."  (*Id.* at 776:14-16).  When asked specifically about the

9

referral of code violations at the Diner[7], he testified that "the Town [B]oard ask[ed] the fire marshal's office [to be] more aggressive [in] enforcement [efforts against] nightclubs throughout the township." (*Id.* at 862:1-9.) Frano did not testify, as Kraft did, about the number of violations and the failure to seek after-the-fact approval from the ZBA increasing the probability of referrals being made.

    Not only did Frano's testimony differ in some material respects from Kraft's, it was also in conflict with portions of his deposition testimony and with what Kiernan told the jury. Central to plaintiffs' selective enforcement claim is the allegation that Kiernan and the other Town employees harbored the goal of driving the Diner out of business by, *inter alia*, issuing violations to the Diner and then referring those violations to the SLA. Frano, under direct examination by plaintiffs' counsel, minimized the number, duration and substance of his conversations with Kiernan about the Diner. He "[didn't] recall speaking to [Kiernan] about the Diner very much at all, if [he] did." (*Id.* at 787:3-4.) Such conversations were "[o]ne or maybe two at most." (*Id.* at 786:25.) And as to the question of whether "Kiernan lead [him] to believe that [he] needed to send a referral to the State Liquor Authority for town code violations," Frano told the jury "No." (*Id.* at 776:19-22.) Yet later during Frano's direct examination, it developed that on December 8, 2009 Frano was asked during his deposition "did either you or [Kiernan] determine that the complaints [about the Diner] should be referred to the state liquor authority" to which Frano answered "I believe Mr. Kiernan had said why don't we make a referral to the SLA." (*Id.* at 788:17-21.) Frano further averred at the December 2009 deposition that he believed that the

---

    [7] Other code violations, besides the one for change of use, were issued as a result of the inspection of the Diner on May 20, 2007, all of which were referred to the SLA on June 20, 2007. (*See* Pls.' Trial Ex. 16.)

code violations issued to the Diner should be sent to the SLA based on a "discussion with the Police Department," and more specifically, with "James Kiernan." (*Id.* at 776:24-777:18.) While Frano acknowledged that he discussed the Diner with Kiernan at least to some extent, Kiernan's testimony was to the contrary. When Kiernan was asked "did you ever have a conversation with Mr. Frano about Town code violations that were allegedly occurring at the [D]iner," he answered "No."[8] (*Id.* at 572:18-21.)

      To partially reiterate, Kraft was the Town official with the authority to determine whether a change of use violation should be referred to the SLA. She identified criteria for such referrals which were applicable to the Diner and not applicable to Buckley's or Tide Runners. However her testimony, for the reasons discussed *supra*, is problematic and may be rejected by the trier-of-fact. And Frano's testimony at trial is out-of-sync with his deposition testimony concerning Kiernan's involvement in the referral process, which deposition testimony is at odds with Kiernan's representations to the jury that he never discussed code violations at the Diner with Frano. Additionally, there is a disconnect between Frano's and Kraft's identification of the factors bearing on the decision to refer a code violation to the SLA.

---

    [8] Parenthetically, Kraft testified at a December 2, 2009 deposition concerning the relationship between the police department and change of use violations being referred to the SLA thusly: "Steve Frano was forwarding the information to the police department for the referrals." (Tr. at 1336:23-1337:10.) Whether that deposition testimony was intended to indicate that Frano forwarded change of use violations to the police department that he intended to send to the SLA as a courtesy, or whether he sent the documents to the police for the department to decide whether a referral should be made, is unclear.

### 4. *Whether the Diner, Buckley's and Tide Runners Were "Preexisting" to the Change in the Town Code Gives Rise to a Material Issue of Fact*

Besides citing the number of violations and the failure to seek after-the-fact approval from the ZBA, defendants posit "[a]nother glaring difference between the Diner and its alleged comparators," viz. that the challenged operations of Tide Runners and Buckley's, unlike the Diner's, predated the Town's enactment of the more restrictive code provision which the Diner was charged with violating. (Defs.' Reply at 2.) Prescinding from the fact that the Town apparently failed to appreciate the proffered "preexisting" distinction given that it issued change of use violations to all three establishments, plaintiffs and their son James testified that the Diner had, *inter alia*, music, a DJ, and dancing, as well as security personnel on hand, well before the subject zoning change. Frano acknowledged that he "d[id]n't know" whether the Diner had such preexisting activities but explained that if it did, it too "would have been grandfathered in." (Tr. at 764:9-24.)

### 5. *Conclusion as to Similarly Situated Prong of Selective Enforcement Claim*

There are distinctions between Buckley's and Tide Runners on one hand and the Diner on the other, the most significant of which are the number of violations and the fact that Buckley's and Tide Runners did submit a belated applications to the ZBA. However, as noted, whether those factors influenced the decision to refer change of use violations to the SLA is a question of fact for a jury to determine, not for the Court to decide as a matter of law. The same is true with respect to defendants' argument that the nightclub operations at Buckley's and at Tide Runners were preexisting, purportedly unlike those of the Diner.

12

Here, as is typically the case, "whether . . . entities are similarly situated is a factual issue that should be submitted to a jury." *Cine SYK 8, Inc. v. Town of Henrietta*, 507 F.3d 780, 790 (2d Cir. 2007). Defendants, of course, recognize that general rule. (*See* Tr. at 908:14-15 ("Ms. deJONG: Your Honor, it is up to the jury to determine if something is similarly situated or not.").) But defendants contend that no reasonable trier-of-fact could conclude, based on the trial evidence, that the Diner, Buckley's and Tide Runners are similarly situated, thus mandating that judgment as a matter of law pursuant to Rule 50(b) be granted in their favor. However, for the reasons explained above, I am not in a position to conclude that such is the case.

Having addressed the threshold "similarly situated" prong of plaintiffs' equal protection claim, attention will now be directed, seriatim, to the proof at trial as to whether plaintiffs were subjected to different or selective treatment based on the Diner catering to a Hispanic clientele.

### B.   *Selective Treatment Prong of Selective Enforcement Claim*

Defendants next argue that there was "no evidence to show that Frano or anyone [else][9] from the Town was aware of any change of use violation by Buckley's before the issuance of the 2008 change of use violation . . . . [or] of any change of use violations by Tide Runners." (Defs.' Mem. at 10.) As correctly noted by defendants, citing *LaTriesta Rest. & Cabaret v. Vill. of Port Chester*, 188 F.3d 65, 70 (2d Cir. 1999), "[w]ithout evidence that the defendants knew of other violations but declined to prosecute them, plaintiffs cannot show selective treatment." (Defs.' Mem. at 11.) The concept of "selective prosecution implies that a selection has taken place."

---

[9] Parenthetically, there is no evidence in the record to suggest that "anyone from the Town" other than Frano was a final decision maker regarding change of use violations being referred to the SLA, or that any other predicate for asserting *Monell* liability against the Town was extant. (*See infra* section I.D regarding discussion of Town's potential liability.)

*LaTriesta Rest. & Cabaret*, 188 F.3d at 70 (internal quotation marks and citation omitted).

To place this argument in context, it is important to remember that only the Town and Frano remain as defendants as to the subject cause of action and that Frano retired from the Town on "June 30 of 2007." (Tr. at 828:21-22.) The issuance of a change of use violation to Buckley's in 2008, (*see* Pls.' Trial Ex. 32), and, more importantly for present purposes, the non-referral of that violation to the SLA, may not be attributed to him in view of his retirement the year before. The citation against Tide Runners was issued on July 3, 2006, *i.e.* prior to Frano's retirement. (*See* Pls.' Trial Ex. 10.) The issuing officer was Alfred Tyczkowski ("Tyczkowski") of the Fire Marshal's Office. (*Id.*) If it was evident, as defendants posit, that Frano was unaware of this ticket being issued by Tyczkowski then that citation, like the one issued to Buckley's, cannot be considered by the trier-of-fact in resolving plaintiffs' claim against Frano. But, here again, the evidence adduced at trial gives rise to a material issue of fact. A jury could inferentially conclude that Frano, as "the person in charge of sending referrals to the State Liquor Authority" (Tr. at 864:19-21), would have been aware of the violation received by Tide Runners. Indeed, while Frano said that he did not "know of" a change of use violation being issued to Tide Runners (*Id.* at 824:9-12), the jury also heard that, in addition to Frano being in charge of referring violations, he had discussed Tide Runners with Tyczkowski (*id.* at 824:25-825:2), that Tyczkowski – a fire marshal – and Frano shared the same supervisor, Chief Fire Marshal Kraft (*id.* at 830:7-8), and that Frano acknowledged during cross examination that he "couldn't recall certain things" asked of him by plaintiffs' counsel on direct given the approximately "4[00] to 500" code violations he wrote each year over a 20 year span (*id.* at 830:12-25.)

Simply put, plaintiffs' evidence as to the selective treatment prong of their selective enforcement claim, though meager, is sufficient to create an issue of fact necessitating resolution by a jury.

### C.     *Impermissible Considerations*

In addition to satisfying the "selective treatment" prong, a plaintiff is required to show that the "differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Harlan Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 503 (2d Cir. 2001); *accord Cine SK8*, 507 F.3d at 790.  Defendants maintain that "[n]o rational jury could find that defendants Frano and the Town treated plaintiffs differently because they catered to a Hispanic clientele," *i.e.*, "that the SLA referral was racially motivated." (Defs.' Mem. at 12.)  While defendants correctly note the lack of direct evidence of racial animus, a jury may infer race-based animus through circumstantial evidence. *See Bishop v. Toys "R" US-NY, LLC*, 2009 WL 440434, at *6  (S.D.N.Y. Feb. 19, 2009) (considering circumstantial evidence of race-based animus in deciding whether to dismiss selective enforcement claim).

In denying summary judgment as to plaintiffs' claim for selective enforcement based on the referral of the change of use violations to the SLA, the Court determined that

> [t]he present record contains enough evidence for a reasonable jury to find that the timing and nature of the referrals creates a sufficient inference that defendants singled plaintiffs out for impermissible considerations.  A reasonable jury of course could also very well conclude that the defendants' referrals to the SLA were appropriate and not based on any form of racial animus.

*Vlahadamis*, 837 F. Supp. 2d at 152.  Having now held a trial in this case, it is the Court's view

15

that the situation has not changed except to the inconsequential extent that it now appears that only one of the three change of use violations received by the Diner were sent to the SLA. As was the case at summary judgment, plaintiffs' evidence at trial regarding racial animus was primarily the timing of events. The sum and substance of this evidence was that prior to hosting "Hispanic Night" the Diner never received a town code violation from defendants and was only inspected on a yearly basis. (*See* Tr. at 57:9-18, 61:15-20, 93:24-94:3, 249:3-9, 273:9-18.) However, shortly after hosting "Hispanic Night" the Diner was subjected to far more frequent inspections and received multiple code violations which were referred to the SLA. (*Id.* at 92:18-93:23, 94:4-15, 273:19-25.)

At trial, defendants countered with evidence that it was not until the Diner held Hispanic Night that the bar area began operating as a nightclub thus triggering greater scrutiny by the Town. (*Id.* at 1169:10-20, 1174:1-19, 1182:1-1183:8.) Moreover, there was testimony at trial to support the contention that the referral of violations to the SLA was in furtherance of the Town Board's initiative calling for the enhanced enforcement of code provisions against establishments operating as nightclubs. Frano testified that, besides the Diner, the Pink Elephant received a change of use violation during the relevant time frame which violation was also referred to the SLA (*Id.* at 752:10-15, 862:1-9, 863:1-868:3.) Defendants, relying on such countervailing evidence, urge that no reasonable jury could find racial animus. However, the evidence cited by defendants merely frames an issue of fact for the jury to determine. The weight or credibility of defendants' evidence is of no consequence under a Rule 50 motion. *See Caruolo*, 226 F.3d at 51.

16

Since there are disputed issues of material fact as to the motivation underlying the referral of the Diner's change of use violation to the SLA, defendants' motion for judgment as a matter of law as to this prong of plaintiffs' selective enforcement also necessarily fails.

### D. *Town's Potential Liability for Actions of Frano*[10]

As detailed earlier, there is evidence in the record suggesting that Frano was the final decision maker for the Town with respect to the subject change of use violation being forwarded to the SLA. Should the jury ultimately determine such to be the case, along with the conclusion that plaintiffs' constitutional rights were violated, then the Town is answerable for that violation as explained in the Court's summary judgment decision dated September 28, 2011. *See Vlahadamis*, 837 F. Supp. 2d at 154-155 (E.D.N.Y. 2011).

### E. **Conclusion as to Selective Enforcement Claim**

Material questions of fact must be resolved as to this claim and, accordingly, defendants' motion for judgment as a matter of law is denied.

### III. *Conspiracy Claim*

Defendants also maintain that they are entitled to judgment as a matter of law on plaintiffs' conspiracy claim against defendant Kiernan. The Court agrees.

To succeed on a conspiracy cause of action under 42 U.S.C. § 1985(3), a plaintiff must show: "(1) a conspiracy (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a

---

[10] Such potential liability is based on *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).

deprivation of a right or privilege of a citizen of the United States." *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999). A conspiracy "need not be shown by proof of an explicit agreement but can be established by showing that the 'parties have a tacit understanding to carry out the prohibited conduct.'" *Id.* (quoting *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 427 (2d Cir. 1995)). Furthermore, "[t]here must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action." *Griffin v. Breckenridge*, 403 U.S. 88, 102, 91 S. Ct. 1790, 29 L. Ed. 2d 338 (1971); *accord Thomas*, 165 F.3d at 146.

In this case, plaintiffs' conspiracy claim is premised on the circumstances leading up to and including the May 25, 2008 "raid" of the Diner by defendant Kiernan and SLA agents Schnall and Perretta. It is not enough that the evidence established that there was an understanding between Kiernan and the SLA investigators to conduct the "raid." Indeed, it is not unusual for the SLA to partner with local police departments in instances that they have shared concerns of suspected unauthorized or unlawful activities occurring at a SLA licensed establishments. (Tr. at 1022:16-1023:12.) As explained by Schnall ("Schnall"), he was hired to engage in such activities with the "NYPD or other municipalities." (*Id.* at 1022:16-1023:2.) Schnall "would go in as a [member of] a multiple agency [task force] and do inspections." (*Id.* at 1023:11-12.) The raid of the Diner was only one of several inspections conducted by that task force over the Memorial Day weekend. (*Id.* at 579:15-580:11.) It is also noteworthy that Kiernan testified that he had met Schnall only once before, and had never met Perretta prior to that weekend. (*Id.* at 644:4-8, 654:11-12.)

18

Another item of evidence cited by plaintiffs with respect to the conspiracy claim is the inclusion of the term "Latin Clientele" in Perretta's notes about the raid. (*See* DeJong Decl. Ex. G.) That notation, however, whether viewed singularly or in conjunction with other trial evidence including the circumstances leading to the raid, and construing all the evidence in favor of plaintiffs, is simply too thin a reed as a matter of law to support the proposition that Kiernan (a) conspired with one or both of the SLA investigators to deprive plaintiffs of their liquor license, or (b) even if, contrary to the fact, the charged tacit agreement existed, that Kiernan's motivation for his conduct – as the sole conspiracy defendant – is traceable, in whole or in part, to racial animus on his part. In sum, the evidence of the alleged conspiracy, while perhaps adequate to raise "some metaphysical doubt as to the material facts" *Matsuchita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1996), was insufficient as a matter of law to permit a reasonable jury to find for plaintiffs on their conspiracy claim.

## CONCLUSION

For the reasons provided, defendants' Rule 50 motion for judgment as a matter of law is DENIED as to plaintiffs' selective enforcement claim and GRANTED as to plaintiffs' conspiracy claim. A pretrial conference prior to the retrial of plaintiffs' selective enforcement claim is scheduled for March 12, 2013 at 2:00 p.m.

**SO ORDERED.**

Dated: Central Islip, New York
  January 29, 2013

_____/s/_____
Denis R. Hurley
Senior District Judge